## No. 12,703.

### ACHILLE E. MARX ET ALS. VS. MEYER BROS. ET AL.

50 1229
50 1075
50 1229
111 1093

1. Several creditors of a common debtor may join as plaintiffs in a revocatory action to annul acts of the debtor and others done in fraud of their rights, and

Marx et als. vs. Meyer Bros. et al.

may make parties defendant in such action all who are charged with complic-
ity in the collusion.

2. While the claims of such creditors may not be cumulated for *jurisdictional* pur-
poses, where, under the averments of the petition, a moneyed judgment is
claimed against defendants largely in excess of the minimum jurisdictional
limit of this court, the appeal will be maintained.

3. The law reprobates all unfair preferences by which an insolvent debtor seeks
to give one creditor an advantage over another.

4. And the fact that the machinery of the law and the courts is used as a cloak to
effectuate the fraudulent purpose aggravates the offending.

APPEAL from the Fifth Judicial District Court for the Parish of
Ouachita.  *Potts, J.*

---

*A. A. Gunby* and *C. Newton* for Plaintiffs, Appellants.

---

*Charles J. Boatner, F. G. Hudson* and *E. T. Lamkin* for Defend-
ants, Appellees.

---

Argued and submitted January 14, 1898.
Opinion handed down April 18, 1898.
Judgment annulled and rehearing refused June 28, 1898.

---

The opinion of the court was delivered by
BLANCHARD, J. "Meyer's Star Emporium" was a mercantile
establishment located at Monroe, Louisiana, with a branch house at
Alexandria.

These establishments were owned and conducted by Mrs. Alice
Meyer, a married woman, separate in property from her husband,
doing business as a public merchant.

Jonas Meyer, her husband, was charged with the direction and
management of the business.

In the summer and autumn of 1896 he made large purchases of
goods in northern cities on credit, based upon representations of the
solvency and prosperity of the firm.

These goods having been received at Monroe and Alexandria, sales
and collections were pressed and much money was realized.

But no debts for the goods thus bought, beyond an inconsiderable
amount, were paid.

The accounts and notes for these purchases were maturing.

District Court was in session in Ouachita Parish in December 1896. The term was drawing to a close and the final adjournment of the court occurred December 24th.

On the evening of December 22nd, about six or seven o'clock, after business hours, and after the office of the clerk of court had been closed for the day, counsel representing certain creditors of Mrs. Alice Meyer appeared at the Court House and dispatched a deputy clerk to the residence of his principal for the key of the office. This being procured the attorney presented and caused to be filed seven suits against the Meyer Star Emporium and its proprietor.

The claims upon which these suits were based aggregated over thirty thousand dollars, and on each the debtor had confessed judgment.

These favored creditors were Meyer Bros., B. & S. Adler, P. Lowenberg, Miss Eva Steinau, Benjamin Adler, the Monroe National Bank and the Merchants & Farmer's Bank.

Meyer Bros. were merchants in Monroe, and *brothers* of Jonas Meyer, the husband and business manager of the debtor.

Besides their own claims against this debtor, they were sureties on the note for ten thousand dollars which the debtor had executed in favor of B. & S. Adler, upon which note the suit of the latter was based.

Meyer Bros. were also endorsers on the paper held by the two banks named, and declared on in their suits.

P. Lowenberg was brother-in-law of Jonas Meyer, and Miss Steinau was the aunt of Mrs. Alice Meyer.

It thus appears that all the claims upon which judgments were confessed were either held by members of the family of the debtor, or secured by some of them.

It also appears that the claims thus confessed were not current indebtedness of the firm in the sense that they represented the recent purchases of goods, except possibly to a small extent. They were, for the most part, over one year old and some of them two years old at the time the judgments were confessed.

The seven suits referred to were entered on the judge's docket on December 23rd., but not on the bar docket of the court. The confessions of judgment were proved up, not in the morning hour of the court, as is the custom at the Monroe bar, but some time in the afternoon (about 3 o'clock) of December 23rd. This was an hour when, usually, few attorneys are present in court.

Judgments, based on the confessions, were immediately signed and executions thereon were issued at once, the same afternoon, in all the cases, and placed in the hands of the sheriff of Ouachita Parish, and *alias* writs thereof sent by special messenger, on that evening's train, to the sheriff of Rapides Parish.

The sheriff of Ouachita immediately seized the Meyer's Star Emporium at Monroe, and early the next morning, December 24th, the sheriff of Rapides seized and closed up the branch house at Alexandria.

These seizures embraced everything owned and possessed by the debtor, including the books and accounts of the business; and all the property and effects, rights and credits thus seized, or attempted to be seized, were advertised for sale under all the writs in the same advertisement at the same time.

Information of the confessions of judgment, and proceedings taken thereunder, coming to the knowledge of other creditors of the debtor, fourteen of them did, on December 24, 1896, file suits, separately, on their claims, coupled with attachment, under which were seized all the goods, effects and property of the debtor—the same antecedently seized by the seven creditors, who had secured the confessions of judgment.

These fourteen creditors, in aid of their attachments, then instituted the present action, the object of which is to set aside, revoke and annul the previous seizures made at the suit of the seven favored creditors, as being a fraud upon their rights.

Asserting a common cause, they unite in one suit and make parties defendant the seven creditors aforesaid, the debtor and her husband, Jonas Meyer, and also the sheriffs of Ouachita and Rapides Parish.

The petition recites the facts and circumstances hereinbefore mentioned, and avers that the seven creditors had acted together throughout with one common design to cover, absorb and exhaust all the property of the common debtor, and that the acts complained of constituted one fraudulent and collusive proceeding inaugurated and carried out for the purpose of defeating the rights of the other creditors and giving an unfair preference to those favored.

They attack the writs of *fi. fa.* and *alias* writs thereof, issued on the seven judgments confessed, as irregular, illegal, null and void, for the reason that they were issued before the judgments had become executory and exigible in this, that they issued before the

term of court, at which the judgments were rendered, had ended, and it is urged that no legal execution can issue on judgments until after the close of the term of court; that judgments do not have any effect, either for the purpose of seizure, nor as judicial mortgages, as against other creditors, until after the final adjournment of the court; and that, accordingly, the executions on the seven judgments, having been issued, without authority of law, conferred no power on the officers to seize property thereunder, and such seizures are illegal and void, made without final process, and no sales of property under the writs could legally be consummated.

They attack the confessed judgments, themselves, as void, on the ground that the common debtor was insolvent to the knowledge of the favored creditors, and, further, the allegation is made that the claims upon which the judgments were confessed were not just and due, and that Mrs. Alice Meyer owed nothing at all to Meyer Bros., nor B. & S. Adler, nor P. Lowenberg, nor Miss Steinau, nor to B. Adler.

It is represented that the confessions of judgment were given to avoid the effect of the law making it a crime for a merchant to sell goods, not paid for, out of the usual course of business with intent to defraud the vendor.

Injunction to stop the sale of the goods seized under the judgments and executions attacked was sought, and an order therefor made, but bond was fixed at thirteen thousand dollars, which plaintiffs could not give, and, thus, no injunction issued.

The prayer of the petition is for judgment decreeing the confessions of judgment, and the judgments based thereon, collusive and fraudulent, null and void, and compelling the seven favored creditors to restore and refund the moneys, property, profit, advantage, or benefit received by them in virtue of the confessed judgments and the proceedings had thereunder.

The suit was filed and the parties cited before the sale of the property, seized under the writs attacked, was made.

The executions were proceeded with and the property was sold, Meyer Bros., one of the seven favored creditors, becoming the purchasers thereof. No part of the purchase price was paid into the sheriff's hands, except costs, taxes, etc. It was retained by the purchaser—the amount thereof being credited by the sheriff on the writs, by order of the attorneys of the seizing creditors.

The property was sold in bulk, that is to say, all the goods in the Monroe store was sold *in globo* as one stock, and the same as to the goods in the Alexandria store. Meyer Bros. were purchasers of both stocks.

Seven other creditors of Mrs. Alice Meyer appear by intervention and join plaintiffs herein, making, substantially, the same allegations and seeking the same relief.

Mrs. Alice Meyer answers averring that the confessions of judgment were given by her in good faith, and because she was advised and believed it was her duty to do so; that the debts were justly due, representing moneys and credits advanced to her commercial business; that being unable to meet same, or secure extensions thereof, she confessed the judgments at the request of the creditors obtaining the same; that her inability to meet her obligations resulted from failure of crops, depression of business in consequence, etc. She denies any purpose to defraud her creditors or give an unfair preference.

The creditors, whose judgments are attacked, deny the fraud and collusion charged; deny any concert of action between themselves to the prejudice of the other creditors, or to obtain an illegal preference; and assert that the proceedings taken by them were in due and ordinary course of law, for the protection and enforcement of their rights according to the laws of the land. They deny the prematurity of the issuance of the writs of *fi. fa.* on their judgments, and aver that if premature the same is nothing more than an irregularity, of which only the judgment debtor may complain.

On the issues as thus made up, the judgment below was in favor of defendants, and plaintiffs and intervenors appeal.

### On Motion to Dismiss Appeal.

Two motions to dismiss are presented.

The first, on the ground of the defective character of the certificate of the clerk attached to the transcript, in that it does not certify that all the proceedings had in the District Court are fully and correctly transcribed. This is met by a motion on behalf of appellants to have the certificate corrected should the court determine there is force in the objection made to the certificate.

We do not find that the motion to dismiss on this ground is insisted on in the brief of counsel for appellees.

Besides, while more care should have been taken in the preparation of the certificate, we do not find it so deficient as to make it necessary to remand for correction, which, otherwise, would be the proper course to pursue.   Barham vs. Livingston, 11th A. 604..

The second, on the ground that this court is without jurisdiction *ratione materiæ* in this, that plaintiffs and intervenors have cumulated their several demands and joined in one action against defendants, and that while the aggregate of these demands is largely beyond the amount necessary to vest this court with jurisdiction, none of the *several* demands of appellants is of a sum sufficient to give the court jurisdiction.

The aggregate of the claims of plaintiffs and intervenors is about twelve thousand dollars, but no one of them equals the sum of two thousand dollars.

That the several creditors who bring this action could legally *join* therein, and could also *join* as parties defendant all who are charged with colluding for the purpose of defrauding them, is not an open question.

Williams vs. Hawthorne, 14 La. Ann. 615-625.

Appellees insist that this is a revocatory action pure and simple, that the several plaintiffs can recover, if successful, only to the extent that the separate interest of each is involved, and that while they can join for the purpose of prosecuting a common demand against a common debtor and others charged with fraud, their claims cannot be cumulated for *jurisdictional* purposes.

In the instant case, however, plaintiffs do not merely seek to avoid the transactions complained of in their effects upon themselves (34 La. Ann. 1215), but the prayer is to annul them outright. Thus, the annulment is demanded of the confessions of judgment given the favored creditors, as well as the judgments of the court (for more than two thousand dollars in each case) based thereon. Also of the writs of *fi. fa.* issued on the judgments, and of the sheriffs' sales thereunder. An injunction to stop the sales was asked and the order granted, but, as we have seen, never carried out because bond was fixed at an amount exceeding the aggregate of plaintiffs' claims. The grounds upon which the injunction was sought were something more than the usual revocatory grounds. They embraced averments of the illegality and insufficiency of the writs, of the seizures thereunder, of the inventory, appraisement

and advertisement of the property, and on these grounds the executions and sales are sought to be annulled, as well as on the ground that they were but successive steps in the carrying out of a fraudulent and collusive purpose to defeat the rights of plaintiffs by giving an unfair preference to the favored creditors. The *verity* of the claims on which the confessions of judgment are predicated is assailed, and the allegation is made that these claims are not just or due.

In the petitions filed in intervention, besides the prayers already noted, the additional one is made that in the event the property seized is sold or disposed of during the pendency of the suit, Meyer Bros. and the other seizing creditors be condemned *in solido* to pay the value thereof to plaintiffs and intervenors. Thus is sought a judgment against defendants largely in excess of the minimum jurisdictional limit of this court.

These allegations, the various demands made, the relief sought and the decrees prayed for, show that plaintiffs' suit is not merely an ordinary revocatory action where the test to be applied as to jurisdiction is the amount claimed by the complaining creditor.

Had the judgment of the lower court been against defendants, it can not be doubted that an appeal by them would lie to this court. Such a decree would have annulled judgments, executions and sales for amounts very largely in excess of what is necessary to give jurisdiction here, and there might have been a judgment *in solido*, against defendant creditors (such as is now sought here) for the return of the money realized at the sheriffs' sales, as prayed for by intervenors. An appeal by the party cast from such a judgment and decree could not, surely, go to any other court than this. Will it be claimed that defendants might come here with their appeal, but plaintiffs cannot?

The motion to dismiss must be denied.

## ON THE MERITS.

The statement of this case hereinbefore made would seem to render it unnecessary to add much more.

There was a deliberate purpose on the part of this insolvent debtor to give an unlawful and fraudulent advantage to certain creditors. There was equally a purpose on the part of the favored creditors to receive and profit by this advantage.

It was done under the garb of legal sanctity. It was an attempt to shield the property of the debtor from the grasp of certain cred-. itors not favored, and transfer same into the power and possession of certain other creditors who were favored, and this was sought to be consummated through the forms of judicial proceedings.

The foundation of this was laid months before. It began when Jonas Meyer, the manager of the debtor, went to northern cities on a purchasing tour in the summer and fall of 1896. Prior to that time all the debts held by the creditors afterwards favored had been incurred. Theirs were not obligations contracted on the purchasing tour, but the goods of other and later creditors, bought on that tour, were, by the attempt referred to, sought to be diverted from the payment of debts contracted in their purchase, and used exclusively in satisfying anterior indebtedness of one and two years' standing.

These later creditors were, there is strong reason for believing, the victims of a plot, the object of which was to load up the Star Emporium with their goods, sell out as rapidly as possible for cash, appropriate the cash, and then under forms of law turn the remainder of the goods over to the sheriff for the benefit of relatives—making a family affair of the seizure.

The representations made by Jonas Meyer in making the purchases were false and fraudulent. He made statements to the effect that his wife was worth twenty thousand dollars over and above liabilities, and that the crops in his section were good and collections in the fall would be satisfactory. To one vendor of goods he made the further statement that his house only owed one thousand dollars, was in better shape than ever before, and doing a good business. His bill with them was nearly double what he had been in the habit of buying. He told another he was buying larger than usual and gave as a reason that his house was in better condition than ever, that the crops were good and he expected to do a large business. He also bought from this firm twice as much as had been his wont. To another house he made the same statement as an excuse for buying double the usual quantity of goods. Another firm, from whom he had purchased largely more than was his custom, held up the shipment of the goods pending additional information from him relative to his condition. To them he made the statement that his wife possessed assets amounting to two dollars for every one dollar she owed, and on this representation the goods were permitted to go forward.

The real facts were that the debtor was utterly and hopelessly insolvent when Jonas Meyer went north to purchase goods.

She owed then over forty thousand dollars, perhaps as much as fifty thousand dollars. Instead of the crops being good, an unprecedented drought was on, having commenced in April and not ending until October, which destroyed the crops to an extent so great that government and other aid was solicited in behalf of the stricken region.

Jonas Meyer admitted on the stand he knew the condition of the crops when he started North to make his purchases.

He kept concealed from those he traded with the fact that his house owed Meyer Bros. an enormous sum. He told them only of the small indebtedness due the banks in Monroe.

The fact was that Meyer's Star Emporium owed Meyer Bros. between forty-five thousand dollars and fifty thousand dollars in notes, accounts and loans, and from the testimony it appears that the indebtedness of the house must have been about sixty thousand dollars when the seizure occurred.

Jonas Meyer returned to Monroe from the North in October. He had bought his goods on such terms as to time that the bills would not mature until late in December and through January. Not one of plaintiffs' and intervenors' claims was four months old when the seizure was made.

Notwithstanding the drought the business shows cash sales and receipts for October, November and December amounting to about thirty thousand dollars. This is exclusive of sales on credit. But up to the time the stores were closed by seizure, it does not appear that anything was paid on account of the thirty thousand dollars worth of goods purchased in the summer and fall, save the paltry sum of about nine hundred dollars.

Early in December Herman Meyer, of Meyer Bros., wrote Adler, who held a claim for ten thousand dollars (for which Meyer Bros. stood surety), telling him the Star Emporium was in a bad way and advised him to send his claim right away to attorneys (mentioning the law firm who were his own attorneys), that they might protect . his interest.

About the same time Miss Steinau (aunt of debtor) was written to by her brother, David Steinau, living in Monroe, to send her claim to the same legal firm. One of the Steinaus (Albert) was a clerk in the debtor's store.

All of the claims held by the parties who were to be favored were cumulated in the hands of the same attorneys.

There is no pretence that the insolvency of the debtor was not known to these creditors, or their representatives. It was certainly known to the attorneys, and their action, which was that of the creditors, was influenced thereby. C. C. 1984; 2 R. 38; 3rd La. Ann. 248; 6 La. Ann. 552; 4th La. Ann. 329; 8 La. Ann. 81. One of the attorneys, who testified, admits that the judgments confessed were more than enough to cover all the property seized.

It is vain for these creditors and this debtor to deny complicity and co-operation. The confessions of judgment themselves (a favor conferred upon a select few only, all represented by the same agents) demonstrate this. These confessions were all signed at the same time at the debtor's residence. Every facility was extended by the debtor, and accepted by the creditors, to put their claims in such form as to be quickly executory against the property, proceedings were unduly expedited to this end, while the debtor stubbornly, and even bitterly, contested the suits brought by other creditors, even those who did not attach or sue to revoke. She not only fought their claims and attachments, employing several lawyers in the defence, but demanded in reconvention fifty thousand dollars damages against those who, after the stores had been closed by the seizure at the suit of the favored creditors, had the temerity to levy attachments on the same goods.

Not only did the debtor utter no word of complaint against the seizure made by the preferred creditors, but it appears that Jonas Meyer was active in the endeavor to thwart the other creditors. Plaintiffs herein were frustrated by him in the efforts made by their counsel to obtain sureties on the injunction bond, which, if obtained, would have stayed the sale of the goods under the executions issued on the confessed judgments pending this litigation.

The ground for the attachment of the goods by the excluded creditors, after the same had been seized at the suit of the favored creditors, was the preference shown the latter by the insolvent debtor in the confessions of judgment executed in their favor. The judge below sustained the attachments, notwithstanding the strenuous defence made against them by the debtor.

In preparation for the collapse, the debtor, a few days before the confessions of judgment were given, sold for cash the only piece of

real estate she owned, and on the very day of the confessions she disposed of her stock in the Building and Loan Association of Monroe for twelve hundred and thirty-seven dollars and sixty cents. Besides this, all the cash on hand in bank and in the store disappeared just as the seizure was coming on. Yet Jonas Meyer testified he did not know the store was to be seized, and this notwithstanding he had, the day before, signed the confessions, with his wife, in authorization of her, and knew the court was in session.

In the desire and haste to include all who were intended to be favored, and exclude others, judgments were actually confessed on claims not yet due. One of the notes sued on by the Merchants and Farmers' Bank was not due and the note itself was at the time in New York as collateral security for a loan the bank had contracted there. The president of this bank testified he did not know *how* the confessions were taken, or *why* taken. This note, held by the bank and not due, was the one P. Lowenberg, brother-in-law of the debtor, was endorser on. So, too, the note for two thousand one hundred dollars held by the Monroe National Bank (and likewise confessed on) did not mature until December 22, the very day the confessions were signed and the suits filed. Counting days of grace this note was not demandable until December 25, 1896. It thus appears to have occupied the fortunate position of having had judgment by confession entered upon it before it was actually due.

The solicitude about this note is easily accounted for by the fact that Herman Meyer, of Meyer Bros., brother of the debtor's husband, was guarantor thereof.

It is a circumstance worthy of remark that none of the members of the firm of Meyer Bros. went upon the stand in this hotly contested and protracted litigation, notwithstanding the large interest they had in its outcome and the fact that they lived in Monroe where the case was being tried.

Meyer Bros. purchased at the sale the stock of goods in Monroe, and that in Alexandria, as well as the other property seized, including notes, accounts and other assets.

After the purchase, they conducted both businesses at the old stand. Jonas Meyer was retained as salesman at the Monroe house.

After buying the goods at a price far less than their real value, Meyer Bros. published an advertisement of the stock of merchandise of the Star Emporium for sale, in which it was stated to be a bank-

FIFTIETH ANNUAL REPORTS, 1898.          1241

Marx et als. vs. Meyer Bros. et al.

rupt sale of thirty thousand dollars worth of goods, purchased by them at sheriff's sale at great sacrifice, and to be sold for cash regardless of cost. It is shown that in the months of January, February, March, April, May, June and July, 1897, their cash sales of these goods amounted to twenty thousand dollars.

On the first of August, a large remnant of the stock unsold was moved into Meyer Bros. store, and Jonas Meyer still continued to be salesman there.

What the sum total was, eventually realized by Meyer Bros. from this bankrupt sale, is not shown.

Nor does it appear whether they were accountable to the other seizing creditors for their share of what was realized at the private sales, or only for such creditors' *pro rata* of the sum for which they bid in the property at the sheriffs' sales.

We do not find it necessary to pass upon any of the numerous bills of exception, found in the record.

They relate to the rulings of the court *a qua* admitting or refusing evidence offered. We will say, however, that much testimony offered by plaintiffs was excluded that should have been admitted. Averments of fraud and collusion enlarge the scope of the reception of evidence.

The law of Louisiana does not recognize " preferred " creditors. It mercilessly reprobates all unfair preference by which an insolvent debtor seeks to give one creditor an advantage over another. And it declares that a debtor's property being the common pledge of his creditors, every act, device or machination by which they are prejudiced may form the subject of the revocatory action. C. C. 1969. The fact that the machinery of the law and of the courts is used to effectuate the fraudulent purpose, aggravates the offending. Newman vs. Baer, 50th La. Ann. —; Prats vs. Creditors, 5 R. 288; Stone vs. Kidder, 6 La. Ann. 552; Muse vs. Yarborough, 11 L. 530; 35 La. Ann. 885.

The case at bar is almost identical in its facts with Blodgett vs. Hogan, 10 La. Ann. 18, and the principle there announced must govern here. If the stock of goods and property of this debtor had been conveyed by private act, under the circumstances mentioned, to the favored creditors, the transaction would not stand a moment before the assault of the complaining creditors. Nor can it be held any more stable because sought to be done under cloak of the forms of law.

Plaintiffs and intervenors are entitled to the alternative remedy, of either having the confessions of judgment, the judgments based thereon and the executions and sales thereunder annulled, and the property, or its proceeds, applied to payment of their demands, or to judgment for their debts against the possessors of the property, or its proceeds.   Stone vs. Kidder, 6 La. Ann. 552; C. C. 1977.

It is, therefore, ordered, adjudged and decreed that the judgment appealed from be annulled, avoided and reversed, and it is now ordered and decreed that, in so far as plaintiffs and intervenors herein are concerned, the confessions of judgment executed by Mrs. Alice Meyer in favor of the seven creditors hereinbefore named, the judgments of the court a qua based thereon, and the executions and sales thereunder of the debtor's property, be set aside and annulled, and that the property sold under said executions, or its proceeds, be applied to payment of the claims of the plaintiffs and intervenors herein, and that to this extent and for this purpose plaintiffs and intervenors do have judgment and recover of the seven creditors referred to, in solido, the amount of the proceeds of said property as shown by the sheriffs' returns on the executions aforesaid.

It is further ordered and decreed that, in the alternative, plaintiffs and intervenors do have and recover of Meyer Bros. and the individual members of that firm, purchasers and possessors of all the property sold under the executions aforesaid, in solido, the amounts due said plaintiffs and intervenors, respectively, by the insolvent debtor, Mrs. Alice Meyer.

It is further ordered, etc., that the costs of both courts be taxed against defendants and appellees.

MR. JUSTICE MILLER: I dissent on the question of jurisdiction.

## ON APPLICATION FOR REHEARING.

A re-examination of this case discovers no ground for setting aside the judgment heretofore pronounced by the court.   But we have concluded to amend in one particular the decree rendered, and, accordingly, it is amended and reannounced so as to read as follows:

It is, therefore, ordered, adjudged and decreed that the judgment appealed from be annulled, avoided and reversed and it is now ordered and decreed that, in so far as plaintiffs and intervenors herein are concerned, the confessions of judgment executed by Mrs.

Alice Meyer in favor of the seven creditors heretofore named, the judgments of the court *a qua* based thereon, and the executions and sales thereunder of the debtor's property, be set aside and annulled, and that the property sold under said executions, or its proceeds, be applied to the payment of the claims of the plaintiffs and intervenors herein, and that to this extent and for this purpose, plaintiffs and intervenors do have judgment and recover of the seven creditors referred to, the amount of the proceeds of said property as shown by the sheriff's returns on the executions aforesaid. It is further ordered and decreed that, in the alternative, plaintiffs and intervenors do have and recover of Meyer Bros., and the individual members of that firm, purchasers and possessors of all the property sold under the executions aforesaid, *in solido*, the amount due said plaintiffs and intervenors, respectively, by the insolvent debtor, Mrs. Alice Meyer.

It is further ordered, etc., that the costs of both courts be taxed against defendants and appellees.

Rehearing refused.